IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GARY J. PINEDA,        :<br>      Plaintiff,       :<br>                     :<br>v.        :<br>                     :<br>PHILADELPHIA MEDIA HOLDINGS    :<br>LLC, PHILADELPHIA NEWSPAPERS  :<br>INC., and ERIC L. MAYBERRY,     :<br>      Defendants.       : | CIVIL ACTION<br><br><br><br><br>No. 07-989 |

## MEMORANDUM AND ORDER

**Schiller, J.**                                                                                        **February 26, 2008**

Plaintiff Gary J. Pineda brings this action against Defendants Philadelphia Newspapers, Inc., ("PNI"), Philadelphia Media Holdings, LLC ("PMH"), and Eric Mayberry. Plaintiff, an Hispanic male of Puerto Rican origin, alleges that his supervisor, Eric Mayberry, discriminated against him during his employment with PNI. PMH is included as a Defendant because it is the successor-in-interest to Defendant PNI. (Am. Compl. ¶ 10.) Plaintiff brings claims pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 ("Section 1981") against PNI and PMH, and pursuant to the Pennsylvania Human Relations Act ("PHRA") against all Defendants. Plaintiff alleges that he was subjected to race discrimination, discrimination based on national origin, and a hostile work environment.

Currently before the Court is Defendants' Motion for Summary Judgment. Plaintiff failed to file a response to Defendant's motion in violation of this Court's Scheduling Order.[1] Although

---

[1] Plaintiff's response to Defendants' motion for summary judgment was due on February 15, 2008. On February 13, 2008, Plaintiff's counsel, Mark Frost, filed a letter with the Court requesting a thirty day extension to respond to Defendants' motion and notifying the Court, for the first time, less than a month before trial, of his desire to withdraw as counsel for Plaintiff. Mr. Frost also indicated that he would be leaving for California on a personal matter the next day. In a telephone call to Mr. Frost's office on February 14, 2008, this Court informed Mr.

a Court may not grant an unopposed summary judgment motion as unconstested, it may nevertheless rule on the merits of that motion and grant summary judgment "if appropriate." FED. R. CIV. P. 56(e)(2); LOCAL R. CIV. P. 7.1(c). For the following reasons, Defendants' motion is granted.

I.  **BACKGROUND**

In light of Plaintiff's failure to respond to Defendants' Motion for Summary Judgment and Defendants' Statement of Undisputed Facts, but cognizant of the Court's duty to consider the facts in the light most favorable to Plaintiff, the Court has drawn the following facts from Plaintiff's Amended Complaint and his deposition testimony. *See Moon v. Dragovich*, Civ. A. No. 96-5525, 1997 WL 180333, at *1 n.2 (E.D. Pa. Apr. 16, 1997).

Plaintiff began working for PNI in October 1997 as an Account Executive; his job was to solicit advertising for certain periodicals owned by PNI, manage those accounts, and maintain preexisting accounts. (Am. Compl. ¶ 15; Defs.' Statement of Undisputed Facts in Supp. of its Mot. for Summ. J. [hereinafter Defs.' SOF] Ex. 3 (Pineda Dep.) [hereinafter "Pineda Dep."] at 22, 35.) Throughout his employment with PNI, Plaintiff was compensated by commission based on a percentage of the advertising revenue generated by his efforts. (Am. Compl. ¶ 17.) Plaintiff initially worked in the Food and Entertainment group, then switched to the Total Marketing Coverage group where he worked until June 2003, when PNI underwent an internal reorganization. (*Id.* ¶¶ 19-20; Pineda Dep. at 27, 62.) As of June 2003, Account Executives were assigned to specific geographic territories in which they were to solicit advertising. (Am. Compl. ¶ 20.) In particular, Plaintiff was

---

Frost's secretary and associate that it would not grant an extension and expressed its intentions to rule on the merits of Defendants' motion. To date, no response to Defendants' motion for summary judgment has been filed.

assigned to a section of Montgomery County, Pennsylvania.[2] (*Id.* ¶ 21.)

After the reorganization, Plaintiff applied for a regional sales position. (*Id.* ¶¶ 25-26; Pineda Dep. at 84-85.) Plaintiff did not get this position; it was given to another employee. (Am. Compl. ¶ 27; Pineda Dep. at 85-87.) In July 2003, however, PNI transferred Plaintiff to a new territory consisting of portions of Center City, Philadelphia, at which point Defendant Mayberry, who is African American, became Plaintiff's supervisor.[3] (Am. Compl. ¶¶ 28-29; Pineda Dep. at 57.) Upon receiving this new territory, Plaintiff was given a file of existing accounts for that area and continued to receive new accounts in that territory. (Pineda Dep. at 96-97.) He was also permitted to keep certain preexisting accounts outside of his geographical territory, including ALDI Foods, one of Plaintiff's larger accounts. (*Id.* at 99, 114.) Plaintiff asserts that "up to this point, [he] had always performed his job at a high level, and had consistently met or exceeded all of his annual performance goals — often times even doubling those goals." (Am. Compl. ¶ 30; Pineda Dep. at 70.)

Plaintiff's first alleged instance of discrimination by Mayberry occurred at a Christmas party in December 2003. (Pineda Dep. at 120.) Mayberry allegedly said to Plaintiff: "You've got to do better than the Charlies and Dennises [the names of two Caucasian PNI employees]." (*Id.*) Plaintiff

---

[2] Although Plaintiff's Amended Complaint asserts that "Defendants took away all of Plaintiff's existing accounts except for those located within Plaintiff's new territory," Plaintiff admitted at his deposition that he kept many of his preexisting accounts based outside of Montgomery County. (*Compare* Am. Compl. ¶ 24 *with* Pineda Dep. at 107-08.)

[3] Plaintiff's Amended Complaint inaccurately describes Mayberry as Caucasian. (Am. Compl. ¶ 29.) Furthermore, Mayberry was not Plaintiff's direct supervisor. Plaintiff's direct supervisors, Mike Gagliardi, Dave Baldwin, and Elaine D'Arienzo, reported directly to Mayberry. However, Plaintiff's allegations of discrimination are targeted only at Mayberry. (Pineda Dep. at 44, 88, 241.)

"took that as meaning that for some reason, they [the Caucasian employees] are superior and being white they are superior and as a person of color, I had to exceed that of a white person based on them being white and me being Hispanic." (*Id.*) Thereafter, beginning in early 2004, Mayberry took certain of Plaintiff's accounts from him and reassigned them to Caucasian employees, causing Plaintiff's income to decrease.[4] (Am. Compl. ¶¶ 32-33; Pineda Dep. at 123-27.) Plaintiff alleges that Mayberry similarly took accounts away from two other African-American employees, and gave those accounts to white employees. (Pineda Dep. at 58, 85, 241-42.) During this time period, Mayberry allegedly told Plaintiff that he "[has] to represent [his] people," and that Plaintiff was not "supporting [his] people," allegedly referring to the Hispanic people in both instances. (Am. Compl. ¶¶ 34, 36-37.) On one occasion, Mayberry told Plaintiff that Plaintiff should see the movie "Fahrenheit 9/11." When Plaintiff replied that he was not a political person, Mayberry asked "what kind of Puerto Rican are you?"[5] (Pineda Dep. at 221.)

In the same time period, beginning in 2004 and continuing into 2005, Mayberry questioned Plaintiff's job performance and berated Plaintiff in front of other employees. (Am. Compl. ¶ 38.) Plaintiff complained to another supervisor that Mayberry was taking accounts away from him, and

---

[4] For instance, Plaintiff claims that Mayberry allowed other employees to keep his Chamber Orchestra account and an account for an attorney in violation of the "thirteen-month rule," which gave priority to the representative who first worked on an account unless that account was inactive for thirteen months. (Pineda Dep. at 48-50.) Plaintiff did not speak with Mayberry about the Chamber Orchestra account; he instead spoke to his direct supervisor, who dealt with the matter. (*Id.* at 52.) Plaintiff's attorney account, which had been assigned to an African American female, was returned to him by Mayberry pursuant to the thirteen month rule. (*Id.* at 50, 53.)

[5] Although the Amended Complaint alleges that Mayberry, in response to learning that Plaintiff voted for President George W. Bush in 2004, asked Plaintiff "what kind of Puerto Rican are you?", Plaintiff denied at his deposition that this discussion ever occurred. (*Compare* Am. Compl. ¶ 35 *with* Pineda Dep. at 223.)

4

eventually complained to his union representative, Bill Ross, that Mayberry was discriminating against him. (*Id.* ¶ 45; Pineda Dep. at 129-34.) In October 2004, Mayberry complained to Human Resources about Plaintiff's mishandling of the ALDI Foods account. (Pineda Dep. at 149, 154.) Large billing discrepancies permeated the account, which had accumulated during the years Plaintiff was handling it. (*Id.* at 139-152.) At one point, the client wrote a letter to PNI complaining about the way the account was handled. (*Id.* at 139-41.) In January 2005, PNI reassigned the ALDI Foods account to a Caucasian employee, Dennis Ponnock; at the time of the reassignment, however, ALDI had terminated its account with PNI. (Am. Compl. ¶ 39; Pineda Dep. at 152-57.)

Around this time, Plaintiff was put on probation, in part due to the issues with the ALDI Foods account. (Pineda Dep. at 176-180.) This was in accordance with company policy, of which Plaintiff was aware, that an employee would be put on probation if he underperformed for two successive periods. (*Id.* at 177.) Plaintiff was subsequently put on probation a second time because the amount of revenue he was producing was declining. (*Id.* at 182-84.)

In February 2005, another employee left PNI and Plaintiff was given that employee's territory and accounts.[6] (*Id.* at 184-85, 225.) Around this time, PNI reassigned one of Plaintiff's long-standing accounts to another employee because, according to Mayberry, the client called to request a new representative after Plaintiff failed to get in touch with him. (*Id.* at 186.)

Plaintiff was out of work on sick leave beginning in June 2005. (Am. Compl. ¶ 47; Pineda Dep. at 194-95.) While he was out, another employee handled Plaintiff's accounts, although Plaintiff

---

[6] Although Plaintiff's Amended Complaint suggests he was stripped of his old accounts, asserting that Plaintiff was "reassigned . . . to a weaker territory," his deposition reveals that he was given this territory in addition to his Center City territory. (*Compare* Am. Compl. ¶¶ 43-44 *with* Pineda Dep. at 184-85, 225.)

would still receive credit for commission on those accounts. (Pineda Dep. at 195-96.) Plaintiff called Elaine D'Arienzo, his direct supervisor at this time, about once a week to update her on his condition; in these instances he would leave a message to report that he did not know when he was coming back to work since he was not responding to treatment. (*Id.*) Although Plaintiff was cleared by a physician to return to work in early August, he returned only for a few days. (*Id.* at 198-99.) When Plaintiff fully returned from sick leave in October 2005, PNI chose to keep his old accounts with the employees who had been assigned to them in Plaintiff's absence. (Am. Compl. ¶ 49; Pineda Dep. at 189-90, 225.) Instead, Plaintiff was given a new territory upon his return to work, but was unable to draw considerable income because it was a weak territory. (Am. Compl. ¶ 50-52; Pineda Dep. at 202-05.) In December 2005, Plaintiff stopped going to meetings and stopped going into work because "[t]here was no point." (Pineda Dep. at 224-26.) Plaintiff subsequently received a letter warning him about the status of his employment. (*Id.* at 225-26.) Although Plaintiff was aware that he would be terminated if he did not respond to the letter, he neither contacted his supervisor nor responded as directed. (*Id.* at 226-27.) Plaintiff was subsequently terminated on December 16, 2005. (Defs.' SOF Ex. 29 (12/16/05 Termination Letter).)

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When the moving party does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial.

6

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the nonmoving party demonstrates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable finder of fact to find for the nonmoving party at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). Furthermore, a court may not make credibility determinations or weigh the evidence in making its determination. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S.133,150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

### III. DISCUSSION

Plaintiff alleges that he was discriminated against on the basis of race and national origin in violation of Title VII, Section 1981, and the PHRA. "Claims under the PHRA are interpreted coextensively with Title VII claims." *Atkinson v. LaFayette College*, 460 F.3d 447, 454 n.6 (3d Cir. 2006); *see also Knabe v. Boury Corp.*, 114 F.3d 407, 410 n.5 (3d Cir. 1997). Likewise, the standards are identical under Title VII and Section 1981. *See, e.g., McKenna v. Pac. Rail Serv.*, 32 F.3d 820, 826 n.3 (3d Cir. 1994). Thus, this Court will analyze Plaintiff's claims under a Title VII framework, and the conclusions will apply equally to his PHRA and Section 1981 claims. *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 317 n.3 (3d Cir. 2000).

#### A.   Plaintiff's race discrimination and national origin discrimination claims fail

Plaintiff's claims of race discrimination and discrimination based on national origin are governed by the burden shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Goosby*, 228 F.3d at 318. Plaintiff must first establish a *prima facie* case of

discrimination by establishing that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he was discharged from that position; and (4) individuals who are not in Plaintiff's protected class were treated more favorably. *See McDonnell Douglas*, 411 U.S. at 802. If Plaintiff establishes such a *prima facie* case, the burden shifts to Defendants to assert a legitimate, non-discriminatory reason for the adverse employment decision. *Goosby*, 228 F.3d at 319. If Defendants set forth such a reason, the burden shifts back to Plaintiff, who must then proffer evidence that the employer's reason is merely a pretext for discrimination. *Id.*

If Plaintiff makes out a *prima facie* case and Defendants offer a legitimate non discriminatory reason for their actions, Plaintiff survives summary judgment by "present[ing] sufficient evidence to raise a genuine issue of fact as to whether the defendant's proffered reasons were not its true reasons for the challenged employment action." *Stewart v. Rutgers*, 120 F.3d 426, 433 (3d Cir. 1997); *see also Jones v. School District of Philadelphia*, 198 F.3d 403, 413 (3d Cir. 1999). Thus, a plaintiff survives summary judgment by proffering "admissible evidence[] that the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it cannot have been the employer's real reason," or by "pointing to evidence in the record which allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Jones*, 198 F.3d at 413 (internal quotations omitted).

Since Plaintiff is a Hispanic male of Puerto Rican origin, he is a member of a protected class. Plaintiff has asserted that he was qualified to handle those accounts that were transferred, and that he was qualified for his job. His deposition testimony further establishes that certain of his accounts were taken away from him and reassigned to white employees — individuals who are not in Plaintiff's protected class. Thus, for purposes of this summary judgment analysis, the Court assumes

that Plaintiff has met his initial burden under *McDonnell Douglas*. Similarly, as discussed *infra*, Defendants have satisfied their burden by pointing to legitimate non-discriminatory reasons that justify their actions. Nevertheless, Plaintiff fails to raise a genuine issue of fact to combat Defendants' legitimate non-discriminatory reasons for its treatment of Plaintiff.

As a preliminary matter, Plaintiff admits that neither his reassignment to Montgomery County as a result of the reorganization nor his inability to procure a transfer to a regional sales position were based on discriminatory intent; as such these allegations cannot form a basis for Plaintiff's claims. (Pineda Dep. at 88, 112-15.) Likewise, Plaintiff does not assert that his transfer to the Center City, Philadelphia territory was based on discriminatory intent; indeed, he considered this territory to present "a great opportunity." (*Id.* at 95-96, 100, 119.) Thus, Plaintiff's claims rest on the following: (1) the transfer of his accounts, primarily the ALDI Foods account, in 2004 and early 2005; (2) his transfer to a weaker territory and loss of accounts in October 2005 and termination thereafter; and (3) the alleged racist statements made by Mayberry.

        *i.*    *The transfer of Plaintiff's accounts in 2004 and early 2005*

Plaintiff's claim of discrimination based on the transfer of his accounts fails. Defendants have set forth a legitimate non-discriminatory reason for taking away Plaintiff's accounts — Plaintiff's mishandling of those accounts. Defendants have come forward with considerable evidence in this regard. First, Defendants present a September 2, 2004 letter from an ALDI Foods billing manager, complaining of an inflated balance of $44,400.58 as of July 31, 2004 and stating that "I [the billing manager] have made numerous attempts since 2002 to have these billing issues resolved. Unfortunately, the assurances I have received from the associates at the Philadelphia Inquirer have not resulted in sufficient action." (Defs.' SOF Ex. 16 (ALDI Letter).) Defendants also

9

present testimony as to the billing problems with the ALDI account, including testimony from one of Plaintiff's direct supervisors, Dave Baldwin, that when he looked into the matter, he learned that Plaintiff was charging ALDI incorrect rates. (*Id.* Ex. 7 (Mayberry Dep.) at 117-19 & Ex. 13 (Baldwin Dep.) at 75, 142.) Finally, Defendants point to a January 2004 letter from Bistro Romano, whose account was handled by Plaintiff, complaining about overdue credits and stating that "I [the client's representative] am very disappointed and upset in [sic] the manner in which this has been handled." (*Id.* Ex. 20 (Bistro Romano Letter).) Defendants tried to help Plaintiff by giving him additional territory in February 2005 to counterbalance the loss of the ALDI Foods account. (Pineda Dep. at 184-85; Defs.' SOF Ex. 19 (10/19/05 Warning Memo) at 2.) Despite Defendants' efforts, however, Plaintiff continued to mishandle accounts. For example, he failed to call any representatives affiliated with one of his newly received accounts for six months. (Defs.' SOF Ex. 19 at 2.)

Plaintiff has adduced no evidence of pretext to combat Defendants' alleged legitimate nondiscriminatory reason for taking away his accounts. Indeed, Plaintiff's own deposition testimony acknowledges the existence of outstanding balances, which were not in fact owed to PNI, on the ALDI Foods account as a result of the way in which Pineda was billing the client.[7] (Pineda Dep. at 135-136, 139-49.) Plaintiff further admitted that sometimes the accounts receivable reports for

---

[7] Plaintiff blames these billing discrepancies on certain management decisions made by Mayberry, citing an alleged discussion about the ALDI account with a person in accounting whose name Plaintiff could not remember. (Pineda Dep. at 148, 163-66.) Even if such evidence could support a finding of pretext, it is inadmissible hearsay as testimony from Plaintiff and because no one has identified the alleged purveyor of the statements. Accordingly, this evidence may not be considered on summary judgment. *See J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990) (evidence must be admissible in some form at trial to be considered on summary judgment).

ALDI would be inaccurate for several months, and acknowledged that there were billing problems with some of his other accounts as well. (*Id.* at 139, 190, 193-94).

Thus, Plaintiff's own testimony demonstrates his poor job performance and corroborates Defendants' underlying rationale for transferring Plaintiff's accounts. Indeed, there is no evidence other than Plaintiff's subjective belief, that Defendants' actions were motivated by anything other than Plaintiff's poor job performance. Without evidence of pretext, summary judgment is warranted on this aspect of Plaintiff's discrimination claims. *See Jones*, 198 F.3d at 414 (affirming summary judgment for insufficient evidence of pretext where plaintiff's allegations were based solely on his beliefs and no record evidence).

Furthermore, Plaintiff may not rely on Mayberry's alleged racist statements to establish pretext since Plaintiff has failed to meet his burden of proving that these statements were in any way related to any of Defendants' employment decisions, either temporally or otherwise. *See Fuentes v. Perskie*, 32 F.3d 759, 767 (3d Cir. 1994) (stray remarks divorced from employment decisions do not support a conclusion of pretext); *Rose v. Woolworth Corp.*, 137 F. Supp. 2d 604, 609-10 (E.D. Pa. 2001) (summary judgment was appropriate where Plaintiff, who received poor performance evaluations, could not prove pretext by pointing to "a handful of insensitive and bigoted statements").

  ii. *The transfer of Plaintiff's accounts and territories in October 2005 and his eventual termination*

Plaintiff also claims that Defendants discriminated against him by transferring his accounts and territories while Plaintiff was on sick leave, and by terminating him shortly thereafter. Defendants counter, as a legitimate non-discriminatory reason for their actions, that they took

11

accounts from Plaintiff and transferred him to a new territory in October 2005 only "after he failed to report to work for a three month period and failed to adequately inform his supervisors and his customers of his status or whereabouts." (Defs.' Mem. of Law in Supp. of Mot. for Summ. J. [hereinafter "Defs.' Mem."] at 3.) Defendants further assert that they terminated him for job abandonment. *Id.* Defendants have proffered considerable evidence that Plaintiff was failing to meet performance goals, that Plaintiff failed to report to work and to attend meetings, and that Defendants sent numerous warnings to Plaintiff regarding his poor job performance and employment status. (*See* Defs.' SOF Ex. 7 at 232-33 & Ex. 12 (D'Arienzo Aff. ¶¶ 3, 5, 7, 9, 10, 14, 17, 19, 23, 25, 27, 30, 31) & Ex. 19 (10/19/05 Written Warning) & Ex. 22 (compilation written warning and probation memos).)

Plaintiff's direct supervisor at the time, Ms. D'Arienzo, acknowledges in her affidavit that Plaintiff left sporadic voicemails for her between June and October 2005 when he was out on sick leave. (*Id.* Ex. 12 (D'Arienzo Aff.) ¶ 7.) Despite these occasional calls, however, "[Plaintiff] failed to adequately communicate with [D'Arienzo] concerning his status and whereabouts, and did not service his assigned accounts." (*Id.*) Upon his return to work in October 2005, Mayberry emailed Plaintiff with his new territory, explaining the change as follows:

> I never said you would not have a territory. I said you would not have the same clients or territory that you had when you took leave. I promised to give you new ZIPs by the end of the day. They are listed below.
> As I said earlier, we made the move of territories and accounts because you went several months without staying in touch with *any* of the clients that you were managing when you left. (Nor did you notify them that you would be off.)

(*Id.* Ex. 27 (10/11/05 Mayberry Email to Pineda); *see also id.* Ex. 7 at 232-33.) Plaintiff's poor performance in handling his accounts was apparent by this point — several of his accounts reflected

billing errors and one of his clients "called . . . and requested a new sales rep due to neglect from their current rep [Plaintiff]." (*Id.* Ex. 19 at 2 & Ex. 26 (PNI account adjustment forms).) Finally, on December 12, 2005, Bill Gaier, the Director of Retail Advertising, sent Plaintiff a final warning letter "due to [his] continued poor performance" including his failure to meet his sales goals and his failure to attend sales meetings.[8] (Defs.' SOF Ex. 29 (12/12/05 Final Warning Letter).) The letter specified in detail the steps Plaintiff would need to take in response to the letter in order to retain his position with the company, which included attending a meeting to discuss the situation. (*Id.*) When Plaintiff failed to respond, he was terminated. (*Id.* Ex. 29 (12/16/05 Termination Letter).)

Again, Plaintiff's own testimony corroborates Defendants' legitimate non-discriminatory reason for transferring him in October 2005 and terminating him in December 2005. Plaintiff acknowledges that he was expected to be at work on a regular basis and that he was expected to tell his supervisor if he was going to be out of the office for a period of time. (Pineda Dep. at 35, 103 (employees were expected to "keep the line of communication with your supervisor" if they took leave).) Plaintiff admits that he stopped going to work and missed many meetings. (*Id.* at 224-26.) Plaintiff further admitts that despite his awareness that he would be terminated if he did not respond to Mr. Gaier's letter, he did not respond as directed. (*Id.* at 226-27.) Although Plaintiff presumably believes that "there was no point" in returning to work because of what he considered to be discrimination, Defendants' actions, as discussed above, were based on Plaintiff's poor job performance. Indeed, Plaintiff acknowledges that Mayberry "expressed to [Plaintiff] that [Mayberry]

---

[8] Pursuant to the Collective Bargaining Agreement between PNI and the Newspaper Guild of Greater Philadelphia, "[a]ny employee who has not met his/her goal may be placed on probation [and] . . . being placed on probation two successive times constitutes a good and reasonable cause for dismissal." (Defs.' SOF Ex. 2 (Bonanducci Aff.) ¶ 18.)

had concerns about [Plaintiff's] work ethic," and admitted that Mayberry would send Plaintiff "emails that [Mayberry] was disappointed in [Plaintiff's] output." (*Id.* at 55, 59.) This is consistent with Mr. Pineda's acknowledgment that as an account executive he "[was] expected to perform in the sense of [his] sales." (*Id.* 61.)

Since Plaintiff has failed to come forward with any evidence establishing pretext and, alternatively, corroborates Defendants' legitimate non-discriminatory reasons for its actions through his own testimony, summary judgment is appropriate on this aspect of Plaintiff's claims. *See Goosby*, 228 F.3d at 322-23 (affirming summary judgment on discrimination claim where plaintiff was terminated while on disability leave but failed to comply with her employer's short term disability policy). To the extent that Plaintiff seeks to prove pretext by relying on Mayberry's statements, such reliance is improper as discussed *supra*.

**B.   Plaintiff's hostile work environment claim fails**

To prevail on a Title VII hostile work environment claim, a plaintiff must demonstrate discriminatory changes in the terms or conditions of his employment through a five-prong test. A plaintiff must prove that: (1) he suffered unwanted, intentional discrimination because of his race; (2) the discrimination was pervasive and regular; (3) he was detrimentally affected by the discrimination; (4) the discrimination would detrimentally affect a reasonable person of the same race in the plaintiff's position; and (5) there is *respondeat superior* liability. *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990). Whether a workplace is hostile or abusive must be determined in light of the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (internal quotations omitted). Along these lines, "[w]hile they should never be condoned, '[r]acial comments that are sporadic or part of casual conversation do not violate Title VII.'" *Al-Salem v. Bucks County Water & Sewer Auth.*, Civ. A. No. 97-6843, 1999 WL 167729, at *5 (E.D. Pa. Mar. 25, 1999) (*quoting McCray v. DPC Indus., Inc.*, 942 F. Supp. 288, 293 (E.D. Tex. 1996)).

Plaintiff's hostile work environment claim is based on Mayberry's alleged statements that Plaintiff "had to do better than the Charlies and Dennises," that Plaintiff "had to represent his people" and "wasn't supporting his people," and Mayberry's asking Plaintiff "what kind of Puerto Rican are you?" in response to Plaintiff's statement that he is not a political person.[9] Even taking Plaintiff's allegations to be true, Mayberry's statements amount to nothing more than offhand comments, most of which are not even clearly discriminatory. Mayberry's statements are vague, and, without any context, lack obvious discriminatory intent. Even assuming that they were motivated by discriminatory intent, however, Mayberry's occasional statements taken together do not amount to pervasive and regular discrimination as a matter of law. *See Barbosa v. Tribune Co.*, Civ. A. No. 01-1262, 2003 WL 22238984 (E.D. Pa. Sept. 25, 2003) (granting summary judgment on hostile work environment claim based on seven alleged incidents of discrimination over eighteen months of employment including plaintiff's allegation that he was called a "spic" on numerous occasions); *Gharzouzi v. Nw. Human Servs. of Pennsylvania*, 225 F. Supp. 2d 514, 535, 538 (E.D. Pa. 2002) (granting summary judgment on hostile work environment claim where six incidents over three

---

[9] Mayberry denies making any such comments to Plaintiff. (Defs.' SOF Ex. 7 at 223-24.)

15

months did not constitute pervasive and regular discrimination). Consequently, summary judgment is appropriate on Plaintiff's hostile work environment claims.[10]

IV.   CONCLUSION

Based on the above, Defendants' motion is granted.[11] An appropriate Order follows.

---

[10] To the extent Plaintiff's hostile work environment claim is based on Mayberry's questioning of his job performance, his claim likewise fails; a supervisor's actions cannot form the basis for a hostile work environment when they are based on a belief that an employee is not performing or acting properly. *See Gharzouzi*, 225 F. Supp. at 534 (*quoting Koschoff v. Henderson*, 109 F. Supp. 3d 332, 346 (E.D. Pa. 2000)).

[11] Because PNI did not discriminate against Plaintiff, summary judgment is likewise warranted on Plaintiff's PHRA claim against Mayberry. *See* 43 PA CONST. STAT. ANN. § 955(e) (supervisory liability is only appropriate under PHRA where a supervisor "aid[s], abet[s], incite[s], compel[s], or coerce[s] the doing of any act declared by this section to be an unlawful discriminatory practice"); *see also Carlton v. City of Phila.*, Civ. A. No. 03-1620, 2003 WL 633279, at *8 (E.D. Pa. Mar. 30, 2004).

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GARY J. PINEDA, | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PHILADELPHIA MEDIA HOLDINGS | : | |
| LLC, PHILADELPHIA NEWSPAPERS | : | |
| INC. and ERIC L. MAYBERRY | : | No. 07-989 |
|     Defendants. | : | |

### ORDER

**AND NOW**, this **26th** day of **February 2008**, upon consideration of Defendants' Motion for Summary Judgment and for the foregoing reasons, it is hereby **ORDERED** that Defendants' motion (Document No. 25) is **GRANTED**. The Clerk of Court is directed to close this case.

BY THE COURT:

_____
**Berle M. Schiller, J.**